COMMERCIAL DISCOUNT
CORPORATION, Plaintiff,

v.

LINCOLN FIRST COMMERCIAL COR-
PORATION, Herbert A. Busch and
David Rothkopf and Phillip Wess, Indi-
vidually and as partners doing business
as Rothkopf & Wess, Defendants,

Richard A. Eisner & Company, Addition-
al Defendant on Cross-Claim.

Herbert A. BUSCH, Defendant and
Third-Party Plaintiff,

v.

RICHARD A. EISNER & COMPANY,
Third-Party Defendant.

No. 76 Civ. 1242.

United States District Court,
S. D. New York.

Feb. 16, 1978.

Paul, Weis, Rifkind, Wharton & Garrison, New York City, by Steven B. Rosenfeld and Leslie G. Fagen, New York City, for plaintiff Commercial Discount Corp.

Evans, Orr, Pacelli, Norton & Laffan, New York City, by Seymour I. Yanofsky and Constantine Regusis, New York City, for defendant David Rothkopf.

D'Amato, Costello & Shea, New York City, by Robert E. Meshel, New York City, for defendant Phillip S. Wess.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

Defendants David Rothkopf and Phillip S. Wess, here sued both individually and as partners formerly doing business as the accounting firm of Rothkopf & Wess, have brought these motions pursuant to Rule 12(b)(1), F.R.Civ.P., to dismiss this action for want of federal jurisdiction over the subject matter. Though so denominated, the motion is actuality is a motion pursuant to Rule 12(b)(6), F.R.Civ.P. to dismiss for failure to state a claim upon which relief may be granted. The complaint adequately alleges subject matter jurisdiction (see note 2 infra, p. i), and, accordingly:

> "the court must assume jurisdiction to decide whether the allegations state a cause of action on which the court can grant relief . . . .

. . . . If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction." Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946).

In 1972, Rusch Factors, Inc., now merged into BVA Credit Corporation and not a party here, entered into a financing arrangement with Lucien Piccard Industries, Inc. (hereinafter sometimes "Piccard"), whereby Rusch Factors was to make revolving loans to Piccard, secured by Piccard's inventory and accounts receivable.

On February 19, 1974, Lincoln First Commercial Corporation ("Lincoln First") bought virtually all of Rusch Factors' commercial financing portfolio, including the revolving loan arrangement with Piccard. Shortly thereafter, the National Bank of North America and the First Pennsylvania Bank each became 25% participants in the loan to Piccard, with Lincoln First as lead lender. Both of these are now additional plaintiffs on Lincoln First's cross-claims against the accounting defendants.[1]

On April 19, 1974 Commercial Discount Corporation ("CDC"), plaintiff here, bought from Lincoln First a 25% participation in Lincoln First's outstanding and future advances to Piccard, with Lincoln First again acting as lead lender.

In its complaint, CDC alleges that in deciding to become a participating lender it relied on statements made by Lincoln First's officers and on the 1973 and 1974 year-end financial statements of Piccard which Rothkopf & Wess had certified without qualification. CDC alleges that these statements were deceptive and that the financials failed fairly to present Piccard's financial position in conformity with generally accepted accounting principles.

Under the Participation Agreement signed by Lincoln First and CDC on April

---

1. Richard A. Eisner & Co., the accounting firm which certified Piccard's prior year-end financials, was joined as an additional defendant on Lincoln First's cross-claims. See our Memorandum and Order dated June 27, 1977.

19, 1974, CDC bought a 25% participation in all of Lincoln First's outstanding advances to Piccard, and bound itself to take a like percentage of subsequent advances, unless on 60 days notice it declined to participate in additional advances. CDC in its turn was to receive from Lincoln First its proportional share (*i. e.* 25%) of the interest earned from Piccard. This was paid at a rate of 14% per annum, which is 4% over the New York Bank Prime Rate.

CDC's contractual relationship under this Agreement was with Lincoln First, not with Piccard. CDC did not lend money to Piccard, nor did it hold evidence of indebtedness signed by Piccard. Furthermore, CDC had no direct interest in the collateral (the accounts receivable and the inventory) pledged by Piccard, though it did have a right to participate in any "[a]mounts received by [Lincoln First] through realization upon the Specific Collateral, in repayment of the principal amount of the Advances," and even though Lincoln First agreed to hold the collateral "as agent of and trustee for" CDC. Participation Agreement §§ 2.2(b) and 3.5.

The Participation Agreement assigned the management of the underlying loan to Lincoln First:

> "[Lincoln First] will have the right to manage, perform and enforce the terms of the [loans to Piccard] . . . for the joint benefit of [Lincoln First] and [CDC], according to [Lincoln First's] discretion and the exercise of its business judgment . . . ." Participation Agreement § 4.1.

As part of its management, Lincoln First alone determined the amounts to be advanced to Piccard; collected and disbursed all monies; and had the power to determine whether Piccard was in default or should be so treated. Lincoln First received and analyzed daily reports on the status of the

debtor, and in turn made weekly or monthly reports to the participants. Finally, while CDC could conduct or participate in audits of Piccard, and indeed did so on occasion, the primary responsibility for auditing the financial condition of Piccard rested with Lincoln First. For its services as manager of the Piccard loan, Lincoln First received ¾% on the outstanding principal balance.

Shortly after CDC entered into the Participation Agreement, Piccard suffered severe financial difficulties when customers exercised their right to return non-defective merchandise for credit, and when it proved unable to realize the book value of its inventory. Piccard became bankrupt in 1975. CDC here seeks to recover its losses claimed to be in excess of $1,000,000.00.

CDC's actions against Lincoln First and its Vice-President Herbert A. Busch have been settled, leaving in the action only the claims against the accounting defendants. These defendants have now moved to dismiss the action arguing that the loan participation is not a "security" under the federal securities laws.

■ Plaintiff CDC has alleged jurisdiction in this Court under both the 1933 and 1934 Acts.[2] With exceptions not relevant here, the definitions of a security under both Acts are essentially the same and are to be read *in pari materia*. *See, SEC v. Galaxy Foods, Inc.*, 417 F.Supp. 1225, 1238 (E.D.N.Y.1976); cf. *Zeller v. Bogue Electric Manufacturing Co.*, 476 F.2d 795, 800 (2d Cir.), cert. denied, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *Welch Foods Inc. v. Goldman, Sachs & Co.*, 398 F.Supp. 1393, 1396–99 (S.D.N.Y.1974).

The definition of a security in the 1934 Act reads in pertinent part as follows:

> "When used in this chapter, unless the context otherwise requires—

**2.** "The jurisdiction of this Court is founded upon 28 U.S.C. § 1331(a); Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v; Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa; and the principles of pendent jurisdiction. This action arises under Section 10(b) of the Securities Exchange Act of 1934,

15 U.S.C. § 78j, and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5; Sections 12 and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77*l*, 77q; and the law of the State of New York. The matter in controversy, exclusive of interest and costs, exceeds the sum of $10,000." Complaint, ¶ 1.

*The term 'security' means any note,* stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; *or any certificate of interest or participation in,* temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, *any of the foregoing* . . . ." 15 U.S.C. § 78c(a)(10). (Emphasis added.)

 The plain language of this section covers the situation here, and, accordingly, under the standard in force in this Circuit, the burden of persuasion is on one attempting to exclude the loan participation from coverage under the federal securities laws. "The best alternative now available may lie in greater recourse to the statutory language. The 1934 Act says that the term 'security' includes 'any note . . [excepting one] which has a maturity at the time of issuance of not exceeding nine months,' and the 1933 Act says that the term means 'any note' save for the registration exemption in § 3(a)(3). These are the plain terms of both acts, to be applied 'unless the context otherwise requires.' A party asserting that a note of more than nine months maturity is not within the 1934 Act (or that a note with a maturity of nine months or less is within it) or that any note is not within the anti-fraud provisions of the 1933 Act has the burden of showing that 'the context otherwise *requires.*' (Emphasis supplied.) One can readily think of many cases where it does—the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account

debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized). When a note does not bear a strong family resemblance to these examples and has a maturity exceeding nine months, § 10(b) of the 1934 Act should generally be held to apply." *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1137–38 (2d Cir. 1976).

 The defendants have failed in their efforts to meet this burden and bring their case within any of the exceptions mentioned by Judge Friendly in *Exchange Nat'l Bank, supra.*

Indeed, most of the arguments raised by defendants rest on an apparent confusion between the status of the original loan and that of the loan participation which CDC acquired. They argue, for example, that "the Participation Agreement . . . and the underlying Lincoln First-Lucien Piccard loan . . . is [*sic*] purely and simply a standard short term collateralized loan transaction wherein the borrower used the monies for working capital purposes." Memorandum of Law of Defendant Wess, at p. 18.

Each of these points is either irrelevant as applied to the loan participation, or lacks a factual basis.

 That the underlying loan here may have consisted of collateralized open-account debt incurred to finance Piccard's operating expenses is of no moment. The loan participation itself was not directly collateralized, and both the power to declare a default in the original loan and control of Piccard's collateral remained with Lincoln First. Furthermore, contrary to defendants' contentions, the loan participation may not be regarded as "short-term." While CDC on 60 days notice could decline to participate in any additional loans to Piccard, it could not thus terminate its original participation, and retrieve the "*status quo.*" A short-term loan however is self-determining by expiration of its stated term.

It is not true that "where the original financing agreement was entered into under a plainly commercial setting, *a fortiori*, a participation in that same financing agreement which was part and parcel of a commercial financing venture could not fall within the legislative framework developed in defining a security." Reply Memorandum of Defendant Wess, p. 14. It is quite logical, and is moreover well established, that a participation in a loan may be a security, even though the underlying loan is not. *See, United California Bank v. THC Financial Corp.*, 557 F.2d 1351, 1357 n. 8 (9th Cir. 1977); *NBI Mortgage Investment Corp. v. Chemical Bank* [1977] Fed.Sec.L. Rep. ¶ 96,066, p. 91,799 (S.D.N.Y.1977) and [1976] Fed.Sec.L.Rep. ¶ 95,632, p. 90,146 (S.D.N.Y.1976).

Defendants' principal efforts on this motion were directed towards establishing "economic reality" rather than mere literal inclusion within the language of the statute as the test for a security. They correctly point out that *Lehigh Valley Trust Co. v. Central Nat'l Bank of Jacksonville*, 409 F.2d 989 (5th Cir. 1969), the only Court of Appeals case to hold that a loan participation is a security, did so solely on the basis of literal inclusion within the language of the statute, an approach now discredited even in that Circuit. *See, McClure v. First Nat'l Bank of Lubbock, Texas*, 497 F.2d 490 (5th Cir. 1974); *Bellah v. First Nat'l Bank of Hereford, Texas*, 495 F.2d 1109 (5th Cir. 1974).

This argument, however, ignores the fact that *every* Court to consider the status of loan participations, including cases cited by the defendants for the "economic reality" test, has agreed that a loan participation was, or could be, a "security." *United California Bank v. THC Financial Corp.*, 557 F.2d 1351, 1358 (9th Cir. 1977); *South Side Bank v. Lakeside Bank*, No. 76 C 2688 (N.D. Ill. Sept. 29, 1977); *NBI Mortgage Investment Corp. v. Chemical Bank* [1977] Fed. Sec.L.Rep. ¶ 96,066, p. 91,799 (S.D.N.Y.1977) and [1976] Fed.Sec.L.Rep. ¶ 95,632, p. 90,146 (S.D.N.Y.1976); *Avenue State Bank v. Tourtelot*, 379 F.Supp. 250, 254 (N.D.Ill. 1974); *Crowell v. Pittsburgh & Lake Erie R.R.*, 373 F.Supp. 1303 (E.D.Pa.1974).

In *Exchange National Bank, supra*, Judge Friendly, after a thorough discussion of the problems inherent in both the "economic reality" and literal approaches, refused to adopt either "test" exclusively to determine the status of unsecured subordinated notes, and instead adopted the presumption of inclusion which we have applied above. While this presumption is easily applied in situations like the present one, in which the "security" does not bear "a strong family resemblance" to one of the commercial exceptions to the statutory language listed by Judge Friendly, it is admittedly of not much help in closer situations.

Consequently, most courts that have considered the question have attempted to derive a rule for their situation from the Supreme Court's discussion of the subject in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) (shares of corporate stock in a Mitchell-Lama housing project are not "securities") and *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) (tie-in scheme of land sales and service contracts is an "investment contract"). Under the Supreme Court's test, inclusion within the 1933 and 1934 Acts is made to depend upon "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Forman, supra*, 421 U.S. at 852, 95 S.Ct. at 2060. *See, Howey, supra*, 328 U.S. at 298–99, 66 S.Ct. 1244.

Judge Friendly, writing for the Court of Appeals in *Exchange National Bank*, found this test to be of "dubious value" when transposed into the context of notes. 544 F.2d at 1136. Even if the "common enterprise" part of the test is accepted as a necessary element of any definition, he found that the second element produced an anomaly:

"[I]t would be hard to think of a situation where profits in the shape of interest are more dependent on the 'efforts of others' than a bank's unsecured short-term personal loan to an individual, the very ar-

chetype of what the securities laws were not intended to cover." *Exchange National Bank, supra,* at 1136–37.

Perhaps the theoretical resolution of this problem rests in the combination of the Supreme Court's approach in *Forman* —which has the appeal of common sense in its suggestion that a security be defined in terms of deriving profits from the efforts of others—with that advocated by Judge Wright in his concurring opinion in *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1260 (9th Cir. 1976). Judge Wright, writing in the context of a bank's efforts to bring a commercial note within the federal securities laws, stressed the factor that "investment situations" can be distinguished from the typical commercial loan situations by looking to the existence or non-existence of superior access to and control of information:

> "The distinction made by Congress between commercial lending transactions and those involving investment securities is a reasonable one. While banks are subjected to risks of misinformation, their ability to verify representations and take supervisory and corrective actions places them in a significantly different posture than the investors sought to be protected through the securities acts.
>
> In an investment situation, the issuer has superior access to and control of information material to the investment decision. Rather than relying solely on semi-anonymous and secondhand market information, as do most investors, the commercial bank deals 'face-to-face' with the promisor." *Kotz, supra,* at 1261–62.

Judge Friendly perceives an anomaly in accepting this position as part of any general test for a security because it could lead to the result that the same note could be a security in the hands of one party and not a security in the hands of another, depending on access to information. If this is an anomaly, it is one which is common enough in the securities area, and is capable of resolution on factual grounds with respect to reliance or not, in connection with the giving or receiving of the note. The incongruity, if there is one, is no greater than that found in this case, in which participation in a loan is properly held to be a security while the underlying loan itself probably is not a security.

In the present case, CDC and Lincoln First entered into a common enterprise, the profits of which were *primarily* dependent on the efforts and managerial skill of Lincoln First. The degree of control over the original loan which CDC obtained in this case is certainly no greater than that held by many investors, and does not deprive CDC of the benefits of the securities laws. Paragraph 4.1 of the management agreement between the parties is practically identical to that considered by Judge Metzner of this Court in *NBI Mortgage Investment Corp. v. Chemical Bank* [1977] Fed. Sec.L.Rep. ¶ 96,066, p. 91,799 (S.D.N.Y. 1977). *See also, South Side Bank v. Lakeside Bank,* No. 76 C 2688 (N.D.Ill. Sept. 29, 1977); *SEC v. Galaxy Foods, Inc.,* 417 F.Supp. 1225, 1239 (E.D.N.Y.1976), *aff'd from the bench on opinion below,* 556 F.2d 559 (2d Cir. 1977).

Finally, Lincoln First undoubtedly had superior control over information on the underlying loan to Piccard: it received daily reports from Piccard and retained ultimate power to declare a default. The affidavits make it clear that CDC's expectation in entering this enterprise was that it was to be a "passive investor."

Accordingly, this loan participation is a security within the meaning of the federal securities laws, and the motions of the defendants Wess and Rothkopf must be, and are, denied.

So Ordered.