PROVIDENT NATIONAL BANK

v.

FRANKFORD TRUST COMPANY.

Civ. A. No. 78–4286.

United States District Court,
E. D. Pennsylvania.

April 16, 1979.

William A. Harvey, Fellheimer, Krakower & Eichen, Philadelphia, Pa., for plaintiff.

Frank D. Allen, Thistle, Moore & Rosser, Philadelphia, Pa., for defendant.

## OPINION

LUONGO, District Judge.

■ This controversy centers around a loan participation agreement between the Provident National Bank (Provident) and the Frankford Trust Company (Frankford). The complaint enumerates five grounds for relief: (1) violations of the federal securities laws, specifically, sections 12 and 17(a) of the Securities Act of 1933 (15 U.S.C. §§ 77*l*, 77q(a) (1976)), sections 10(b) and 29(b) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b), 78cc(b) (1976)), and Rule 10b–5 (17 C.F.R. § 240.10b–5 (1978)); (2) violations of the Pennsylvania Securities Act of 1972 (70 Pa.Stat.Ann. §§ 1–401 to –407 (Purdon Supp. 1978–79); (3) breach of contract; (4) intentional misrepresentation; and (5) negligence. Jurisdiction over the federal securities claim is premised upon 28 U.S.C. § 1331(a) (1976) (federal question) and sections 22 and 27 of the 1933 and 1934 acts respectively (15 U.S.C. §§ 77v, 78aa (1976)); jurisdiction over the remaining state securities and common law claims rests upon the doctrine of pendent jurisdiction. Arguing that the loan participation is not a "security" within the purview of the federal securities laws, the defendant Frankford has moved to dismiss the entire action.[1] I agree that the loan participation at issue here is not a security and I will grant the motion to dismiss.

---

1. The defendant argues that count I must be dismissed for failure to state a claim for relief under the federal securities laws and that the pendent state claims must therefore be dismissed for lack of subject matter jurisdiction.

*See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). I agree that it is procedurally proper to treat the challenge to count I as a Rule 12(b)(6) motion to dismiss.

## I. THE FACTUAL BACKGROUND

■ Viewed in the light most favorable to the plaintiff, the essential facts with respect to the federal securities claim follow. In July 1977, Frankford proposed that Provident "purchase a share of and participate in a loan which Frankford had agreed to make to Olde Kensington Redevelopment Corporation" (Olde Kensington). Complaint ¶ 10. On August 8, 1977, Frankford and Provident signed an Agreement of Participation, under which each bank acquired a nonassignable 50% share in the interest accruing on the loan, in the mortgage and bond securing the loan, and in the repayment of principal. *Id.*, Exhibit A ¶¶ 1, 2, 5.[2] The moneys to be loaned under the agreement were to finance the construction of 25 single family townhouses. *Id.* ¶ 11. The loan ceiling was set at $345,400 and the interest was to float at 1% above the Philadelphia prime rate with a floor of 10%. *Id.*, Exhibit A at 1. The agreement contemplated that the loan would be made in periodic advances, with each party assuming its proportionate share of the loan commitment; the agreement further provided that Frankford might make advances "for the account of Provident Nat'l, thereafter requesting from Provident Nat'l its share in said loan." *Id.*, Exhibit A ¶ 3. In its status as lead bank, Frankford was designated the mortgagee, and all documents executed in connection with the transaction were to be taken in the name of and delivered to Frankford. *Id.*, Exhibit A at 1–2. Frankford also bore the responsibility of monitoring the status of the loan, undertaking to notify Provident of "any defaults by the mortgagor(s) or of any other matter which in its best judgment materially affects the joint or respective interests of the parties [to the participation agreement]." *Id.*, Exhibit A ¶ 4.

Prior to negotiation of the participation agreement, Frankford made the following oral and written representations to Provident:

"(a) That Olde Kensington was a non-profit corporation formed in March of 1968 for the purposes of acquiring abandoned homes, rehabilitating them and making them available for moderate purchase prices or as rentals to low or moderate income families;

.　　.　　.　　.　　.

(c) That the general contractor which would perform and oversee the construction of the townhouses was Mango Construction Company, Inc., a contractor known and approved of by Frankford;

(d) That the general contractor, Mango Construction Company, Inc. had been bonded, in a manner satisfactory to Frankford, under a dual obligee performance, labor and material payment bond by the United Surety and Financial Guaranty Company;

(e) That Frankford would oversee the construction of the townhouses, inspect the premises from time to time, review invoices submitted by Mango and its subcontractors for payment, collect all amounts of principal and interest due from Olde Kensington, police the collateral generally and take all other steps necessary to assure the continued stability and viability of the loan;

.　　.　　.　　.　　.

(j) That Frankford would insure that the property was properly secured and protected."

Complaint ¶ 24.

In reliance upon Frankford's representations, Provident agreed to participate in the loan, and from August to November 1977, paid to Frankford $41,850 as its proportionate share of the loan advances pursuant to the agreement. *Id.* ¶¶ 27, 39.

In early November 1977, Provident attempted, without success, to ascertain from Frankford the status of the loan. *Id.* ¶ 30. Provident's visit to the construction site in mid-November confirmed that work on the project had ceased. *Id.* ¶ 31. Subsequently,

---

2. Because the participation agreement (the authenticity of which is acknowledged by defendant) is incorporated into the pleadings, I may properly consider its significance in ruling on the sufficiency of the federal securities claim.

Provident discovered that Frankford had failed to perform the duties that it had represented it would assume in its role as lead lender. *Id.* ¶¶ 33(c)–(1), 34–37. Provident also determined that, contrary to Frankford's representations,

"(a) the general contractor, Mango Construction Company, Inc., which had been approved by Frankford, lacked the necessary financial ability and expertise from the inception of the project to see the project through to completion; [and]

(b) the dual obligee performance, labor and material payment bond allegedly issued by United Surety and Financial Guaranty Company was, in fact, a forgery, and despite Frankford's assurance to the contrary, there was no valid and enforceable bond in effect. . . ."
*Id.* ¶ 33.

To date, the loan has not been repaid and the security for the loan has not yielded any proceeds. *Id.* ¶ 38.

## II. THE EXISTENCE OF A SECURITY

■ Since there is no diversity of citizenship between the parties, the plaintiff may prosecute this action in federal court only if there is a federal question claim under the federal securities laws, that is, only if it can be said to have purchased a security when it agreed to participate in the loan to Olde Kensington.[3] Both the 1933 and the 1934 acts provide that "unless the context otherwise requires . . . 'security' means any note . . . investment contract . . . or any certificate of interest or participation in . . . any of the foregoing." 15 U.S.C. §§ 77b(1), 78c(a)(10) (1976).[4] Accordingly, the participation agreement at issue here will be cognizable

**3.** This inquiry of course comprehends two separate questions: (1) whether the participation is a security and (2) whether the transaction between Provident and Frankford was a sale. Because the first question is dispositive of this motion, I need not address the latter issue.

**4.** Although the definitions vary slightly, the differences between the two are not relevant here and analysis of the security status of the participation agreement in question is the same under both acts. *See International Bhd. of Team-*

under the federal acts if either (1) the underlying transaction—in this instance, the note or bond exchanged for the loan—is itself a "security" or (2) the participation interest acquired by the plaintiff falls within the catch-all category of investment contract. *See generally* Comment, *Bank Loan Participations as Securities: Notes, Investment Contracts, and the Commercial/Investment Dichotomy*, 15 Duquesne L.Rev. 261, 267–86 (1976–77).

■ In its memorandum opposing the motion to dismiss and again at oral argument, Provident conceded that the underlying instrument was not a security. This obviates consideration of the first alternative, despite Provident's argument that because "the plain language [of the statutes] covers the situation described in the complaint[,] . . . Defendant must demonstrate a statutory exclusion." Document No. 8 at 13–14. This literal approach with its presumption of inclusion that is urged by plaintiff stems from the Second Circuit rule announced in *Exchange National Bank v. Touche, Ross & Co.*, 544 F.2d 1126 (2d Cir. 1976). There, Judge Friendly, having considered the Supreme Court's antiliteral stance in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), nevertheless concluded that "the best alternative . . . may lie in greater recourse to the statutory language," and advised that the plain terms of the acts control unless the party opposing the application of the securities laws demonstrates that "the context otherwise requires." 544 F.2d at 1137–38. Even if I were to disregard the questionable validity of this literal approach,[5] I would neverthe-

*sters v. Daniel,* —— U.S. ——, —— n. 7, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979).

**5.** It is unlikely that the Court of Appeals for the Third Circuit would approve the literal approach advocated by the plaintiff. In *Lino v. City Investing Co.,* 487 F.2d 689, 694–95 (3d Cir. 1973), the Third Circuit rejected the argument that a promissory note was a security. The court noted that "not every plan generating allegations of fraud is a violation of federal securities law" and concluded that the "commercial context of this case requires a holding

less conclude that plaintiff's argument is unavailing, given plaintiff's disavowal of reliance on the underlying transaction. Although a few courts have intimated that the "plain language" of the acts comprehends a participation notwithstanding the nonsecurity status of the underlying instrument,[6] as I read the definitions the "plain language" covers only participations in one of the statutorily enumerated items that merit security status. In my view, therefore, in order for plaintiff's "plain language" argument to apply, the underlying instrument must be a security. Provident's concession that the loan to Olde Kensington did not generate a security therefore effectively defeats any argument based on a literal reading of the acts.

■ As to the second alternative, the Supreme Court has consistently counseled that "application [of the securities laws] turns on the economic realities underlying the transaction . . . ." *United Housing Foundation, Inc. v. Forman, supra,* 421 U.S. at 849, 95 S.Ct. at 2059; *accord, International Brotherhood of Teamsters v. Daniel,* —— U.S. ——, ——, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979); *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); *S. E. C. v. Howey,* 328 U.S. 293, 298, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The security status of this loan participation depends upon whether the "economic realities" satisfy the *Howey* investment contract test.[7] As the Supreme Court stated in *United Housing Foundation v. Forman,* the *Howey* test

> "embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is [1] *the presence of an investment* [2] *in a common venture* [3] *premised on a reasonable expectation of profits* [4] *to be derived from the entrepreneurial or managerial efforts of others."*
>
> 421 U.S. at 852, 95 Ct. at 2060 (emphasis added).

■ Defendant urges that the "economic realities" underlying this transaction reveal simply a routine commercial financing arrangement. Applying the Ninth Circuit's "risk capital" analysis,[8] Frankford contends that this participation agreement is not an investment contract but rather a risky loan gone awry, and that the securities acts were not designed to facilitate loan collection. Provident, on the other hand, argues that the allegations in the complaint satisfy the *Howey-Forman* standard by demonstrating

---

that the transaction did not involve a 'purchase' of securities." *Id.* In focusing upon the commercial or investment characteristics of the transaction, the Third Circuit is aligned with the Fifth, Seventh, and Tenth Circuits, generally following what has become known as the "investment-commercial" test. *E. g., McGovern Plaza Joint Venture v. First of Denver Mortgage Investors,* 562 F.2d 645 (10th Cir. 1977); *C. N. S. Enterprises, Inc. v. G. & G. Enterprises, Inc.,* 508 F.2d 1354 (7th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *McClure v. First Nat'l Bank,* 497 F.2d 490 (5th Cir. 1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975). *See generally* Lipton & Katz, *"Notes" Are Not Always Securities,* 30 Bus.Law. 763 (1975).

6. *See United Cal. Bank v. THC Financial Corp.,* 557 F.2d 1351, 1357 n. 8 (9th Cir. 1977) (citing *Lehigh Valley Trust Co. v. Central Nat'l Bank,* 409 F.2d 989, 992 (5th Cir. 1969)); *Commercial Discount Corp. v. Lincoln First Commercial Corp.,* 445 F.Supp. 1263, 1267 (S.D.N.Y.1978).

7. "The test is whether the scheme involves [1] an investment of money [2] in a common enterprise [3] with profits [4] to come solely from the efforts of others." *S. E. C. v. Howey,* 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946).

8. Recognizing that the distinction between investment and commercial transactions becomes less obvious in the banking context, the Ninth Circuit adopted the "risk capital" test to aid its efforts to distinguish a "risky loan" from an investment. *Great W. Bank & Trust v. Kotz,* 532 F.2d 1252, 1257 (9th Cir. 1976). The risk capital analysis focuses upon six factors: (1) time, (2) collateralization, (3) form of the obligation, (4) circumstances of issuance, (5) relationship between the amount borrowed and the size of the borrower's business, and (6) the contemplated use of the funds. *Id.* at 1257–58; *accord, Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.,* 583 F.2d 426, 432–34 (9th Cir. 1978); *United Cal. Bank v. THC Financial Corp.,* 557 F.2d 1351, 1358–59 (9th Cir. 1977). *See generally* Pollock, *Notes Issued in Syndicated Loans—A New Test to Define Securities,* 32 Bus.Law 537, 544–45 (1977).

the participation agreement to be "a common enterprise in which Provident expected a return on its investment and the results of which were primarily dependent on Frankford's managerial skill." Document No. 8 at 16. Provident characterizes itself as a "passive investor" and emphasizes Frankford's "superior access to and control of the investment decision . . .." *Id.* at 22.

## A. *The State of the Law*

The two most recent decisions dealing with the precise issue presented here—the security status of a loan participation—perhaps best illustrate the competing considerations and provide a perspective for evaluating the arguments advanced in the case before me. Not surprisingly, Provident relies almost exclusively upon the analysis in *Commercial Discount Corp. v. Lincoln First Commercial Corp.*, 445 F.Supp. 1263 (S.D. N.Y.1978). The suit there involved a 25% participation purchased by Commercial in Lincoln's outstanding and future advances to Lincoln's debtor. The agreement of participation provided Commercial with a 25% share in the interest earned on the loan and in any amounts realized from the sale of the collateral. As lead lender, Lincoln had sole control over the management of the loan, with the right to determine the amounts to be advanced to the debtor and the power to declare a default. The court determined that the participation was a security and applied the rule, unique to the Second Circuit, that the "plain terms" of the act control unless the party contesting the applicability of the acts shows that the "context otherwise requires." The court held that Lincoln had failed to overcome this presumption of inclusion. It rejected Lincoln's argument that the underlying loan was collateralized, noting that Commercial had no *direct* interest in the collateral because

> "[t]he loan participation itself was not directly collateralized, and both the power to declare a default in the original loan and control of [the borrower's] collateral remained with Lincoln First."

*Id.* at 1266.

Addressing the applicability of the *Howey-Forman* test, the court in *Commercial Discount* recognized the difficulty of distinguishing a "typical commercial loan situation" from an "investment situation." It attempted to facilitate this distinction by engrafting onto the *Howey-Forman* test the "superior access" distinction advanced in the concurring opinion in *Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1262 (9th Cir. 1976). Applying this reformulated standard, the court noted that "Lincoln First undoubtedly had superior control over information on the underlying loan" and that Commercial's realization of profits from the loan participation was "*primarily* dependent on the efforts and managerial skill of Lincoln," then concluded that Commercial was a "passive investor" and that the loan participation was a security. 445 F.Supp. at 1268 (emphasis original).

*FBS Financial, Inc. v. CleveTrust Realty Investors*, [1978] Fed.Sec.L.Rep. (CCH) ¶ 96,341 (N.D.Ohio 1977), stands for the contrary proposition. At issue was the security status of a subparticipation in a construction loan. As in *Commercial Discount*, the court in *FBS Financial* faced the formidable task of sketching the contours of the securities acts to distinguish a commercial lending from an investment transaction. In denying to the plaintiff the protection of the securities laws, the court measured the participation against the *Howey-Forman* criteria, interweaving aspects of the commercial-investment [9] and risk capital analyses.

Looking to the first prong—the presence of an investment—the court in *FBS Financial* recognized the dilemma inherent in attempts to bring within the securities laws transactions that originate in a commercial setting:

> " 'In one sense, every lender of money is an investor since he places his money at risk in anticipation of a profit in the form of interest. Also, in a broad sense every investor lends his money to a borrower

**9.** *See* cases cited note 5 *supra*.

who uses it for a price and is expected to return it one day.'"

*Id.* at 93,156 (quoting *C. N. S. Enterprises, Inc. v. G. & G. Enterprises, Inc.,* 508 F.2d 1354, 1359 (7th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975)).

It therefore drew upon the Ninth Circuit's "risk capital" test as an aid in ascertaining whether the participation evidenced a "risky loan" or an investment. Noting that there was substantial collateral and a firm commitment from a take-out lender, the court determined that the money exchanged for the participation had not been employed to obtain capital assets and concluded that these various factors militated against finding an investment. *Id.* at 93,-157. Addressing the "reasonable expectation of profits" strand of the *Howey-Forman* formula, the court emphasized that the interest was at a fixed rate, that there was no anticipated appreciation in the value of the so-called "security," and that it was unable to differentiate the profits expected in the participation arrangement from the return expected in an ordinary commercial transaction. *Id.* at 93,158. As for the requirement that the profits be derived from the entrepreneurial or managerial efforts of others, the court noted that

> "[t]he interest income . . . was to be derived from the completion of the construction of the . . . office building according to schedule, the good faith compliance of the borrowers and guarantors, and the willingness of the permanent lenders to keep their take-out commitments. *The accomplishment of these goals was to be monitored and facilitated by [the lead's] management services, but it cannot be said that the interest income to the participants was 'to be derived from' any 'managerial efforts' of* [the lead lender]."

*Id.* at 93,159 (emphasis added).

Finally, after underscoring the plaintiff's expertise and sophistication as well as its easy access to information about the borrower, the court concluded that the subparticipation was outside the scope of the federal securities laws. *Id.*

### B. *The Participation Agreement*

■■■ Measuring the transaction before me against the requirements of *Howey* and *Forman,* I conclude that the participation agreement does not evidence the economic characteristics of a "security." While the common enterprise requirement is clearly met by the very nature of the participation arrangement, the other elements of the test (whether Provident's advances to Frankford for the benefit of Olde Kensington were (a) an *investment for profits* (b) dependent upon the *managerial or entrepreneurial efforts* of Frankford) are almost certainly not satisfied.

### *An Investment for Profits*

Provident forcefully urges that I adopt the rationale of *Commercial Discount,* but I believe that the analysis in *FBS Financial* is better-reasoned and more closely comports with the view of the Court of Appeals for the Third Circuit, as evidenced in *Lino v. City Investing Co.,* 487 F.2d 689 (3d Cir. 1973).[10] Although the Third Circuit, in following the investment/commercial test, has not adopted the "risk capital" test espoused by the Ninth Circuit, I nevertheless agree with the court in *FBS Financial* that the "risk capital" considerations are helpful in ascertaining whether the particular participation arrangement evidences an investment. Accordingly, I have followed the lead of the *FBS Financial* court in incorporating elements of both the "risk capital" and "investment/commercial" analyses.

Here, as in *FBS Financial,* the availability of collateral strongly suggests a commercial transaction. *See FBS Financial, Inc. v. CleveTrust Realty Investors, supra,* [1978]

---

**10.** I realize, of course, that the rationale employed in ascertaining the security status of a particular note does not necessarily obtain in the context of a participation, but to the extent that each inquiry requires the court to distinguish a commercial banking from an investment transaction, the "note" cases (and the commercial-investment dichotomy drawn therein) are relevant.

Fed.Sec.L.Rep. (CCH) ¶ 96,341 at 93,156. Although the mortgage from Olde Kensington runs in favor of Frankford, the participation agreement gives Provident a 50% share in the collateral. Complaint, Exhibit A ¶ 1 at 3. Under such circumstances, it is unrealistic to suggest, as did the *Commercial Discount* court, that the loan participation itself was not directly collateralized. This simply ignores the economic reality of granting the participant a share in the collateral—namely, that the participant's interest is secured to the extent that it will be entitled to a pro rata share in any proceeds realized from the sale of the collateral. Moreover, unlike the situation in *Commercial Discount*, Frankford did not have complete control over the collateral, for the participation agreement expressly conditioned the exercise of any right under the mortgage (including the power to declare a default) upon the mutual consent of the parties to the participation. *Id.,* Exhibit A ¶ 4 at 3–4.

Additional considerations further militate against finding a "security." There was no public offering and there is no indication that the participation interest was "procured for speculation or investment." *See Lino v. City Investing Co., supra,* 487 F.2d at 694–95. There was no expectation of capital appreciation; on the contrary, the return expected by Provident was simply the repayment of the amounts advanced plus a fixed rate of interest. Although profits in the form of a fixed return are no less profits as envisioned by the *Howey* test, when considered with the factors already mentioned, a fixed rate of interest contributes to the impression that this was a commercial undertaking rather than an investment.

### Entrepreneurial or Managerial Efforts of Others

Provident has also failed to satisfy the final element of the *Howey-Forman* test—that the profits be subject to the entrepreneurial or managerial efforts of others. The responsibilities undertaken by Frankford appear to be routine, loan-monitoring

tasks. Although Frankford directly supervised the loan and bore the responsibility of policing the collateral, its efforts were not managerial or entrepreneurial in the sense that they generated the return expected by the parties to the participation. On this score, I am in complete agreement with the *FBS Financial* court's characterization of the respective roles of lead bank and participating lender:

> . . . it is evident that centering this responsibility in [lead lender] is indigenous to a loan participation. Efficient and effective loan administration could not be achieved if the administration were decentralized among all participants. But this necessary concentration of the "management services" . . . did not render those services "entrepreneurial," as required by *Howey* and *Forman* . . . [and] it cannot be said that the interest income to the participants was "to be derived from" any "managerial efforts" of [the lead].

*FBS Financial, Inc. v. CleveTrust Realty Investors, supra,* [1978] Fed.Sec.L.Rep. (CCH) ¶ 96,341 at 93,159.

Finally, the agreement belies Provident's characterization of itself as a "passive investor." Neither party could assign its share without the consent of the other. Complaint, Exhibit A ¶ 2 at 3. Provident had the right to make inspections and appraisals. *Id.,* Exhibit A ¶ 3 at 3. That it chose to rely upon Frankford does not alter that right or diminish Provident's status vis-a-vis Frankford. Furthermore, as I mentioned earlier, the exercise of rights in the collateral required the mutual consent of the parties to the agreement. *Id.,* Exhibit A ¶ 4 at 3–4. Given these considerations, I cannot reasonably infer that Provident was, in this transaction, an unsophisticated investor deserving of protection under the federal securities acts. Nothing about this transaction earmarks it as anything other than a routine commercial financing agreement between two banks, and the economic realities simply will not support the conclusion that this participation is a "security."

### III. CONCLUSION

■ It is evident from the foregoing discussion that Provident has failed to state a claim for relief under the federal securities acts and that count I must be dismissed pursuant to Rule 12(b)(6). Inasmuch as counts II–V (the state securities and common law claims) are pendent to the federal claim, the disposition of count I removes the jurisdictional peg for counts II–V. I will therefore grant defendant's motion to dismiss the entire complaint.

### ORDER

This 16th day of April, 1979, it is

ORDERED that the Defendant's Motion to Dismiss Count I for Failure to State a Claim for relief under the federal securities laws is GRANTED. It is

FURTHER ORDERED that the pendent state claims in Counts II–V are DISMISSED for lack of subject-matter jurisdiction.