Andre **TANUGGI**, Plaintiff,

v.

**GROLIER INCORPORATED, the Grolier Incorporated Profit Sharing Plan of December 31, 1955, the Grolier Incorporated Retirement Plan, Americana Corp., Grolier Interstate, Inc., Defendants.**

**No. 77 Civ. 1126 (RWS).**

United States District Court,
S. D. New York.

May 7, 1979.

Alexander & Green, New York City, for plaintiff by Jeffrey A. Lowin and Craig M. Walker, New York City, of counsel.

Satterlee & Stephens, New York City, for defendants by Robert M. Callagy and James F. Rittinger, New York City, of counsel.

## OPINION

SWEET, District Judge.

In the course of the trial of this action, the court made certain rulings on the proposed special verdict form and granted defendant Grolier Incorporated's ("Grolier") motion pursuant to Rule 12, F.R.Civ.P. to dismiss, at the close of his case, one of plaintiff Andre Tanuggi's ("Tanuggi") causes of action. The principal issue raised was whether the retirement benefits claimed by Tanuggi upon his termination from Grolier's retirement plan constituted a "security" and thus gave rise to a cause of action under the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ("Securities Acts") and the rules promulgated thereunder by the Securities and Exchange Commission ("SEC"). Tanuggi's complaint also included causes of action under the Employee Retirement Income Security Act of 1974 ("ERISA") 29 U.S.C. § 1001 *et seq.*, and state law theories of contract, waiver, and estoppel.

The motion to dismiss the Securities Acts claim was granted and relief under the remaining claims was limited. Because of the issues implicated in its rulings the court undertook to set forth at a later time its underlying reasoning. This opinion seeks to fulfill that undertaking and to resolve certain issues relating to the final relief.

Tanuggi, a French citizen, was employed by Grolier or its subsidiaries as a European sales representative for Grolier publications, principally the Encyclopedia Americana. At his own election in 1971, the plaintiff was enrolled in the Grolier Incorporated Retirement Plan (the "Plan"), the company's shared contribution, defined benefit pension plan. In August, 1974 plaintiff's participation in the Plan was terminated over his protest. The instrument governing the Plan, a January 1, 1971 Agreement and Declaration of Trust ("Agreement") entered into by Grolier and the manager-trustees, of the plan provides that:

—An employee agrees to contribute a mandatory, minimum three per cent (3%) of his annual earnings to maintain his status as a participant.[1]

—Employer contributions are made annually at the direction of the Plan's trustees, according to an actuarial determination of the amount required to maintain the overall level of anticipated benefits. The employer contributions are not made on behalf of any individual employee.

—The employee-participant, after ten years of credited service, becomes entitled to a fixed annuity, payable in monthly installments upon retirement.

—The amount of deferred benefits to which an employee becomes entitled is determined by a formula with two variables: the employee's number of years of credited service and his highest average salary over a five-year period. The total amount is a function of each employee's life expectancy.

—Participants' benefits do not in any significant way depend on the investment skill of the Plan's trustees because the annual employer contributions account for shortfalls in earnings.

—A participant risks losing his benefit under the Plan only if the employer is legally dissolved, declared bankrupt, or permanently ceases to contribute its actuarially determined share. In such event, each participant shares equally in the loss. If the employer permanently ceases its contributions, the assets of the plan are used to purchase deferred annuities for the participants in the amount of their mandatory contributions, plus four per cent (4%) annual interest. Neither this nor other of the communications from the company indicated that a participant's income would fluctuate with the Plan's investment fortunes.

The issue thus presented is whether the securities acts apply to a voluntary, shared contribution, defined benefit pension plan,[2] under the principles recently enunci-

---

1. The Plan also has a voluntary contribution component whereby an employee-participant may contribute up to ten per cent (10%) of his annual earnings above the mandatory minimum. That additional seven per cent, or any portion thereof, is accounted for separately with respect to each contributing employee. Earnings and losses attributable to the voluntary contributions are allocated *pro rata* to each employee, as in a profit sharing plan. Here Tanuggi's contributions never exceeded the minimum mandatory level. We therefore do not reach the question of whether an interest in this component of the Plan is an interest in a security. Even if the voluntary contribution component of the plan is a security within the meaning of the Acts, we are nevertheless not precluded from finding that plaintiff's participation in the plan was confined to participa-

tion in a "non-security aspect" of the total benefit package. *See, SEC v. United Benefit Life Insurance Co.,* 387 U.S. 202, 207, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967); *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 476 (5th Cir. 1974), (the sale of cosmetics and the promotion of cosmetics distributorships involve mixed security and non-security aspects); *Commercial Discount Corp. v. Lincoln First Commercial,* 445 F.Supp. 1263, 1267 (S.D.N.Y.1978), ("participation in a loan may be a security, even though the underlying loan is not").

2. The definitions of "security" in § 3(a)(10) of the 1934 Act and § 2(1) of the 1933 Act are virtually identical. *Teamsters v. Daniel, supra,* —— U.S. at ——, 99 S.Ct. at 795 n. 7; *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 44 L.Ed.2d 621

ated by the Supreme Court in *International Brotherhood of Teamsters v. Daniel,* —— U.S. ——, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979) ("*Daniel*").[3]

The *Daniel* court held that the definitional scope of the securities acts was not broad enough to encompass interests in "non-contributory, compulsory" pension plans. *Id.* —— U.S. at ——, 99 S.Ct. at 802.[4] *Daniel* involved a member of a Chicago Teamsters local whose rights to pension benefits under a collectively-bargained-for plan were extinguished for failure to meet a continuous service requirement. The pensioner sued, claiming that the alleged misrepresentations and omissions by the Union and his employer gave rise to a cause of action under the securities laws.

■ The *Daniel* court concluded that of the instruments included in the definition of a security under the Acts, only the term "investment contract" could be said to cov-

er an interest in a pension plan. *Id.* —— U.S. at ——, 99 S.Ct. at 795.[5]

■ To determine whether the financial relationship represented by an employee's interest in his employer's pension plan constitutes an investment contract, the test is "whether the [pension plan] scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* —— U.S. at ——, 99 S.Ct. at 796, *citing SEC v. W. J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). As reaffirmed in *Daniel,* "The touchstone [of the *Howey* test] is the presence of an investment in a common venture premised on a *reasonable expectation of profits* to be derived from the entrepreneurial or managerial efforts of others." *United Housing Corp. v. Forman,* 421 U.S. at 852, 95 S.Ct. at 2060, (emphasis supplied).

(1975); *Tcherepnin v. Knight,* 389 U.S. 332, 342, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); *1050 Tenants Corp. v. Jakobson,* 503 F.2d 1375, 1377 n. 2 (2d Cir. 1974); *Commercial Discount Corp. v. Lincoln First Commercial Corp.,* 445 F.Supp. 1263, 1265 (S.D.N.Y.1978).

"The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

15 U.S.C. § 77b(1).

3. The term "defined benefit plan" means a pension plan which does not provide an individual account for each employee-participant, and which computes its benefit amounts on the basis of a formula which does not involve the allocation of contributions to an individual employee-participant. Sections 3(34), (35) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1002(34), (35). The Grolier Plan's provision for an annual, lump sum employer contribution which, rather than being fixed, varies according to the trustee's actuarial computation places this plan within the ERISA definition. *See, Alabama*

*Power Co. v. Davis,* 431 U.S. 581, at 593 n. 18, 97 S.Ct. 2002, 52 L.Ed.2d 595 (1977), cited in *Daniel, supra,* —— U.S. at ——, 99 S.Ct. at 794 n. 3.

4. The reasoning of *Daniel* may be applied to numerous pension plan questions left open by the court's limited holding with respect to this "compulsory, noncontributory" plans. *See, Schlansky v. United Merchants and Manufacturers, Inc.,* 443 F.Supp. 1054, 1060–62 (S.D.N. Y.1977), (following the Seventh Circuit's opinion in *Daniel v. International Brotherhood of Teamsters,* 561 F.2d 1223 (7th Cir. 1977), *aff'ing* 410 F.Supp. 541 (N.D.Ill.1976)). *But see Hurn v. Retirement Fund,* 424 F.Supp. 80 (C.D. Cal.1976); *Robinson v. UMW Health and Retirement Funds,* 435 F.Supp. 245 (D.D.C. 1977); *Weins v. International Brotherhood of Teamsters* CCH Fed.Sec.L.Rep. ¶ 96,005 (C.D. Cal.1977).

For a discussion of the open questions after *Daniel* see 181 N.Y.C.J. 48, March 12, 1979 at 1, col. 1.

5. In the context of a pension plan, the terms "investment contract" and "certificate of interest in or participation in a profit-sharing agreement" have substantially the same meaning. *Teamsters v. Daniel, supra,* —— U.S. at ——, 99 S.Ct. at 795 n. 11 citing *Forman,* 421 U.S. at 852, 95 S.Ct. 2051. *But Cf. Exchange National Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1136 (2d Cir. 1976) (the investment contract test is of "dubious value" in the context of unsecured, subordinated notes).

■ The *Daniel* analysis of a pension plan divided the *Howey* test into two component parts: 1) an investment of money and 2) the expectation of profits from a common enterprise. Each element must be applied separately to the "economic realities" of the plan and in "terms of the Acts' purposes." *Id.* ── U.S. at ──, 99 S.Ct. at 796. A pension plan interest cannot comport with the commonly held understanding of an investment contract if it fails to meet either element of the *Howey* test. *Id.*

The Supreme Court has defined "reasonable expectation of profits" to mean either capital appreciation *resulting from* the development of the initial investment, . . or a *participation in earnings* resulting from the use of investors funds. *United Housing v. Forman, supra*, 421 U.S. at 852, 95 S.Ct. 2051 (emphasis supplied).

■ With respect to a pension plan, the profit element of the *Howey* test is not satisfied when the benefits due a participant upon retirement are not primarily dependent on the success or failure of the trustees' investment efforts to generate asset earnings. *Daniel, supra*, ── U.S. at ──────, 99 S.Ct. at 797–798. The prospect of participating in asset earnings must be more than "speculative and insubstantial" to fall within the scope of the Securities Acts. *Id.* When an employee's participation in a pension plan does not include this substantial profit characteristic of a security, the fact that such participation is voluntary and involves giving up a specific consideration in return for a financial interest does not make the absence of the profit characteristic less conspicuous. That an employee has acquired a financial interest by electing to participate in a con-

tributory plan does not automatically make his interest a security. Further analysis of the plan's benefit and payout provisions in light of the "total compensation plan" is required before that interest can be called a security under *Daniel*. *See Id.* ── U.S. at ──, 99 S.Ct. at 798. Applying *Daniel's* interpretation of the profit element to Tanuggi's interest in the Grolier Plan, the court concludes that he does not have an interest in an investment contract and that he therefore does not have a security. The court need not address therefore, the "investment of money" or "common enterprise" elements of the *Howey* test.

Under the terms of the Plan and in the wording of the informational brochures which were sent to the plaintiff, and other employees whom Grolier considered eligible, the benefits an employee participant receive have only a tenuous connection to the investment success of the pension fund.

There is no provision for any employer's individual participation in the fund's asset earnings. The employer (Grolier) is required to make an annual contribution to the fund of the total amount necessary to cover any shortfalls in earnings and the balance of the defined benefit account. Unlike a profit sharing plan, these fixed benefit provisions are substantially the same as those of the plan analyzed in *Daniel*. Here the sole effect of the fund's investment success or failure is an amount of mandatory contributions needed to maintain the financial health of the Plan. Conversely, a participant's benefits are affected to a much greater degree by the Plan's 10-year vesting and credited service requirements.[6] The amount a participant will

---

**6.** As set forth in the Grolier brochures and documents submitted by the plaintiff credited service is defined as the number of years of continuous service by an employee from the date of employment to the date of disability, termination of employment or early or normal retirement.

The employee-participants were also told the following: .
 "If your annual compensation for any calendar year, beginning Jan. 1, 1971, is under $2,000, you will not be credited with a year of

service for that year UNLESS such reduced compensation resulted directly from your having been seriously disabled during that year."
 "You contribute 3% of your annual earnings, provided such earnings are in excess of $2,000 for any calendar year. The maximum mandatory contribution is $3,000 (3% of $100,000). These contributions must be made from the date you enter the Plan until your normal, early, or disability retirement date."

receive is a function of his earnings and length of service and only remotely a function of investments made by the trustees. As in *Daniel*, "the importance of asset earnings in relation to the other benefits received from employment is diminished . . . ." *Id.* —— U.S. at ——, 99 S.Ct. at 798.

Tanuggi's interest in the Plan is more like an interest in a deferred, fixed annuity than an investment contract. *See SEC v. Variable Annuity Life Insurance Company of America*, 359 U.S. 65, 89–90, 79 S.Ct. 618, 3 L.Ed.2d 640 (1958), (Brennan, J. concurring); *SEC v. United Benefit Life Insurance Company*, 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1966); 1 Loss, *Securities Regulation* 506–11 (1961). Here, the plan's appeal to the participant is its insurance-like "stability and security" and not the prospect of growth. *See SEC v. United Benefit, supra,* at 211, 87 S.Ct. 1557. The Plan simply receives the employee contributions from the employer and applies them towards a group annuity. *See,* Loss *supra,* at 508.

■ Consequently Tanuggi's minimum interest in the defined benefit plan is not a security lacking as it does a sufficient connection to the profits earned by the fund. Further support for the court's conclusion derives from analysis of the Plan under the "risk capital" approach commented upon in *United Housing Corp. v. Forman, supra,* 421 U.S. at 857 n. 24, 95 S.Ct. 2051, and used extensively in the Ninth Circuit. *See generally United California Bank v. THC Financial Corp.,* 557 F.2d 1351 (9th Cir. 1977); *Great Western Bank and Trust v. Kotz,* 532 F.2d 1252 (9th Cir. 1976); *El Khadem v. Equity Securities Corp.,* 494 F.2d 1224 (9th Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974), and cases cited therein.[7] The risk of loss arising from the failure of the employer to contribute and inadequate investments is a different type of risk than that commonly associated with a security. *See Teamsters v. Daniel, supra,* —— U.S. at ——, 99 S.Ct. at 798; *SEC v. Variable Annuity, supra,* 359 U.S. at 90–91, 79 S.Ct. 618 (Brennan, J. concurring); *Robinson v. UMW, Health and Retirement Funds,* 435 F.Supp. 245, 247 (D.D.C.1977). *Cf., El Khadem v. Equity Securities Corp., supra,* at 1228. Neither the terms of the plan nor Grolier's characterization of it in commerce indicate that Tanuggi intended to make, or was given to believe, that he was making an "investment for profit".

"If you discontinue your required contributions to the Plan you will lose credit for all service prior to your entry into the Plan and for the period during which you do not contribute to the Plan."

"The normal form of retirement benefit shall be a life income with the first monthly payment of a Participant's retirement benefit being due on his retirement date, if he is then living, and the last monthly payment being due on the last monthly due date on which the Participant is living."

"The . . . plan provides . . . an annual retirement income, after 25 years of credited service, of 40% of a participant's 'average annual earnings.' An additional retirement income of 1% of average earnings is payable for each year in excess of 25 up to 35 years of such service. Thus a person retiring with 35 or more years of service will receive an income of 50% of his average earnings. Lesser benefits are payable for those having between 10 to 25 years of service. Benefits under the plan are reduced by the Social Security benefits available at normal retirement date. The maximum retirement income is limited to $50,000 per year."

"[Employer] contributions are not made specifically on behalf of each participant as was with the Profit Sharing Plan but are allocated by the insurance company among all participants on an actuarial basis that takes into consideration the funding of individual past and future service credits."

"The company [makes] substantial contributions to [the] Plan. Company contributions are about half again as much as were its contributions to [a prior] Profit Sharing Plan."

"The employer contribution customarily amounts to approximately twice the total amount contributed by the participating employees as a group."

*See* Note, Interest in Pension Plans as Securities: *Daniel v. International Brotherhood of Teamsters,* 78 *Colum.L.Rev.* 184, 190 n. 39 (1978).

7. The *Forman* court declined to adopt the "risk capital: approach in the context of an interest in a cooperative housing project. *Id.* 421 U.S. at 857, n. 24, 95 S.Ct. 2051. The court did not, however, foreclose its use in other settings. *Id.*

The securities laws were not designed to regulate this type of transaction.

The Plan cannot be characterized as one of the countless and variable schemes devised by those who seek the use of money of others on the promise of profits. *Daniel, supra,* at 8; *United Housing Corp. v. Forman, supra,* 421 U.S. at 854, 95 S.Ct. 2051; *Robinson v. UMW, supra,* at 247.

Lastly, the enactment of the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 832, 29 U.S.C. § 1001 *et seq.* is adequate protection for this plaintiff. "Whatever benefits employees [with interests in non-contributory, compulsory plans] might derive from the effect of the Securities Acts are now provided in more definite form through ERISA." *Daniel, supra,* —— U.S. at ——, 99 S.Ct. at 802. The same reasoning applies here. *See, Robinson v. UMW, supra,* at 247.[8]

*The Appropriate Relief*

The relief demanded by Tanuggi was immediate money damages. The court concluded that such relief was inappropriate, and informed counsel before trial that the relief, if any, to be awarded would consist of a determination by the court of periodic defined benefit which Tanuggi would receive in 1988, his normal retirement date.[9]

The amount of the periodic benefit would be computed by the court, based upon information supplied by the jury in the special verdict form.

■ In effect, the court held that by bringing this action Tanuggi elected to become an "ineligible participant" as that term is used in Section 7.04 of the Trust Agreement. In pertinent part, Section 7.04 reads as follows:

"The benefits accrued for such a Participant under this Plan through the date of his becoming ineligible shall be retained hereunder for the benefit of the ineligible Participant until the happening of a contingency calling for a disposition thereof at which time the applicable provision of this Plan shall be applied with respect to such benefits."[10]

---

8. 29 U.S.C. § 1132 provides in pertinent part:
(a) A civil action may be brought—
(1) by a participant or beneficiary—
(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
In passing, this court notes that there is currently pending before the Senate Human Resources Committee a bill (S.209) which could provide greater anti-fraud coverage under ERISA for plans not within the scope of the securities acts. 490 BNA Sec.Reg. Reporter, February 14, 1979, at A–16. *See also,* 78 *Colum.L. Rev.* 184, 197–199 (1978).

9. See note 7, supra.

10. The full text of Section 7.04 is as follows:
*Section 7.04—Ineligible Participant—Transfer of Employment—*
If a Participant shall cease to meet the requirements of *Section 1.06,* although still in the employment of the Employer, the Participant shall become an ineligible Participant. The Employer shall promptly notify the Trustees' of this ineligibility and contributions on his behalf shall cease as of such date. The benefits accrued for such a Participant under this Plan through the date of his becoming ineligible shall be retained hereunder for the benefit of the ineligible Participant until the happening of a contingency calling for a disposition thereof at which time the applicable provision of this Plan shall be applied with respect to such benefits. In the event that such ineligible Participant shall again meet the requirements of *Section 1.06* the Employer shall promptly notify the Trustees and he shall again become a Participant under this Plan on the following anniversary date. The Employer and the Participant shall resume their contributions on his behalf on said next anniversary date. The normal retirement income to be provided on such resumption of eligibility shall be reduced, however, by the actuarial equivalent of normal retirement income at normal retirement date represented by any benefit accrued hereunder by reason of such a Participant's previous participation under this Plan.
The transfer of a Participant in whole or in part from the payroll of one of the Employers hereunder to the payroll of one or more of the other Employers hereunder shall not be construed as a termination of employment. Upon the occurrence of such an event, the Employers concerned shall notify the Trustees and the liability of the Employers concerned as to contributions to be made on behalf of such a Participant on the next and succeeding anniversary dates following such transfer shall be according to the source and amount of the compensation thereafter paid to the Participant. The Employers concerned shall give all suitable

Accordingly, the court has determined that Tanuggi's defined benefit as an ineligible participant must be retained by the Trustees until 1988, at which time the periodic payments to Tanuggi shall commence.

This approach is consistent with the holding of the New York Supreme Court in *Alt v. Long Island Railroad Co.*, 81 Misc.2d 99, 365 N.Y.S.2d 480. *Alt* was a declaratory judgment action under New York law, where plaintiff sought determinations of their rights under a company pension plan. In its opinion, the court held that:

> Until an employee qualifies for a pension, he acquires no contractual right in the fund beyond those sums actually contributed by him plus such interest that the Managers of the fund might fix (*Gould v. United Traction Co.*, 282 App. Div. 812, 122 N.Y.S.2d 662). It is not until retirement age is reached that an inchoate right ripens into a pension right in such amount as shall be determined by the age, wage, and years of service of the member (*Silfen v. United Whelan Corporation*, 30 A.D.2d 523, 290 N.Y.S.2d 417).

Here, the jury found that Tanuggi qualified for a pension because he was a participant in the plan who had more than ten years of credited service. As in *Alt*, Tanuggi's right to benefits under his state law theories of recovery remain inchoate until the year he reaches retirement age. This approach to the issue of what constitutes appropriate relief mirrors the text of Section 502 of ERISA, 29 U.S.C. § 1132. In pertinent part that Section provides that

> (a) A civil action may be brought—
>> (1) by a participant or beneficiary—
>> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan

*Id.* As demonstrated above, Tanuggi has no benefit due to him under the Plan until he reaches retirement age. Therefore, his sole remedy is to clarify his rights to future benefits.

For the foregoing reasons, defendants' motion to dismiss the securities acts count is granted. The relief to be awarded plaintiff shall be as indicated above.

IT IS SO ORDERED.

---

directions to the Trustees to accomplish any necessary changes in its records.
Section 1.06 provides:
*Section 1.06—Employee—*
Shall mean any person, excluding anyone for whose benefit the Employer contributes to a pension, retirement or deferred profit sharing plan pursuant to the requirements of a written collective bargaining agreement employed by the Employer on a regular, fulltime, permanent basis excluding any person whose customary employment is for not more than twenty (20) hours in any one week, or for not more than five (5) months in any calendar year.
Insofar as the Employer, GROLIER INCORPORATED, is concerned, it shall mean not only any person employed by it who meets the foregoing requirements but it shall also mean any such person meeting the foregoing requirements who is a citizen of the United States and who is an employee of any domestic subsidiary (within the meaning of Section 407(a)(2) of the Internal Revenue Code) of GROLIER INCORPORATED except such an employee whose Employer has itself specifically adopted and is covering its employees under this Plan. By such action the Employer, GROLIER INCORPORATED, expressly intends to provide contributions and benefits under this Plan for such employees within the meaning of Section 407(a)(1)(A) and (B) of the Internal Revenue Code. The compensation of each such employee who is treated as an employee of the Employer, GROLIER INCORPORATED, under the foregoing provisions, shall be the compensation base, as defined in *Section 1.03*, paid to such individual by the domestic subsidiary that is his Employer.
Insofar as the Employer CARIBE GROLIER, INC. is concerned, it shall mean any person employed by said Employer who meets the foregoing requirements and is working for said Employer in the United States and Puerto Rico, or any such person working for said Employer outside said areas if the person is a citizen of the United States and is not a Participant under any deferred pension, retirement or profit sharing plan maintained by said Employer in the foreign country where such United States citizen is working.