**Velma O'NEIL, on behalf of herself and all others similarly situated, Plaintiffs,**

v.

**MARRIOTT CORPORATION, et al., Defendants.**

Civ. A. No. J–77–495.

United States District Court, D. Maryland.

May 11, 1982.

---

Stanley R. Jacobs, Bethesda, Md., Eugene Mittelman, Washington, D. C., for plaintiffs.

Terrence M. Finn, Baltimore, Md., Burton A. Schwalb, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

SHIRLEY B. JONES, District Judge.

Velma O'Neil, on behalf of herself and a class of similarly situated persons, brought this action relating to the administration of the Marriott Corporation Employees Profit-Sharing, Savings and Retirement Plan and Trust (the Plan) against Marriott Corporation and eleven individuals, all but one of whom are, or were, corporate officers and all of whom are, or were, trustees or other fiduciaries of· the Plan. Suit is brought under federal and state securities laws (Claims I and II), the Employee Retirement Income Security Act of 1974 (ERISA) (Claims III, IV and V), and state common law (Claim VI).

Claim I of the Amended Complaint (Paper No. 52) charges fraud in connection with the purchase of a security, in violation of § 17(a) of the Securities Act of 1933 (the 1933 Act), 15 U.S.C. § 77q(a); § 10(b) of the Securities Exchange Act of 1934 (the 1934 Act), 15 U.S.C. § 78j(b); Rule 10b–5 of the Securities Exchange Commission, and the Maryland Securities Act, Md. Corp. & Ass'ns Code Ann. § 11–301 (1975). The first count alleges that beginning in 1960 and "continuously thereafter" defendants induced plaintiffs to contribute to the Plan by a series of misrepresentations and omissions of material fact, which are then set forth in general terms with some specific examples (¶ 28, 29); that defendants concealed and failed to disclose several material facts, which are set forth (¶ 30); and that the pattern of misrepresentations and omissions was part of a calculated design to use Plan assets to advance defendants' interests by ensuring that a large block of Marriott stock was in the "safe" hands of an owner not likely to sell it the Plan. (¶ 31). Claim II of the Amended Complaint relates only to the individual defendants. Most of the previous allegations are adopted by reference, and it is asserted that the individual defendants conspired wilfully to commit the acts for their own benefit and that of Marriott Corporation, to the detriment of the Plan and its participants and beneficiaries.

Claims III, IV and V incorporate by reference the allegations of all preceding claims. Claim III asserts violations of § 403(c)(1) of ERISA, 29 U.S.C. § 1103(c)(1), which requires that plan assets never inure to the benefit of the employer, and § 404(a)(1), 29 U.S.C. § 1104(a)(1), which requires fiduciaries to discharge their duties solely in the interest of participants and beneficiaries. Claim IV asserts that the conduct constitutes a violation of § 406(b)(1) and (2) of ERISA, 29 U.S.C. § 1106(b)(1) & (2), which prohibits a fiduciary's dealing with plan assets in his own interest or that of another with interests adverse to the Plan. Claim V asserts that conduct of the individual defendants violated § 404(a)(1)(B) and (C) of ERISA, 29 U.S.C. § 1104(a)(1)(B) & (C), which require a fiduciary to discharge his duties with the care of a prudent man and to diversify investments so as to minimize the risk of loss.

The final count, Claim VI, reasserts most of the preceding paragraphs and asserts that the individual defendants violated common law duties as fiduciaries of the Plan.

Defendants have moved to dismiss the complaint, or alternatively for summary judgment, and the parties have briefed the legal issues extensively. Oral argument was heard on May 7, 1982. Matters outside the pleadings, chiefly concerning the nature of the Plan, have been referred to by both sides and considered by this Court. To the extent that the motion to dismiss is one for failure to state a claim, it has been treated as a motion for summary judgment pursuant to F.R.Civ.P. 12(b).

## THE SECURITIES ACTS CLAIMS

Defendants moved to dismiss Claims I and II, which are brought under federal and

state securities law, for failure to state a claim on the grounds that plaintiff's interest in the Plan is not a security and that she has not sustained the kind of pecuniary loss necessary to support a claim under the securities laws. Plaintiff disputes these contentions, and also asserts that she may bring an action under the securities laws on behalf of the Plan as a trust beneficiary.

### 1. Plaintiff's interest in the Plan as a security

The Supreme Court held in *Teamsters v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), that an interest in a noncontributory, compulsory, defined benefit pension plan was not a security under the Securities Act of 1933 or the Securities Exchange Act of 1934. The Court applied the two-part test of *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), finding no "investment of money," 439 U.S. at 559–61, 99 S.Ct. at 796–97, and no "expectation of profit" derived solely from others' efforts, *id.* at 561–62, 99 S.Ct. at 797. There are a few reported cases applying *Daniel* to other kinds of pension plans, although none of the Fourth Circuit and none involving this kind of plan. The United States Court of Appeals for the Ninth Circuit held that an interest in the California Public Employees Retirement System was not a "security" because, although it was contributory, participation involved no reasonable expectation of profits. *Black v. Payne*, 591 F.2d 83, 87–88 (9th Cir. 1979). Benefits were determined by a statutory formula, not based on the plan's income. *Id.* at 87. Because the plan was non-profit, income generated from investment of its assets was either credited to employer contributions or reserved against later deficiencies. *Id.*

A plan with employee voluntary contributions and defined benefits, a fixed annuity based on years of service and amount of salary, was found not to be an investment contract in *Tanuggi v. Grolier, Inc.*, 471 F.Supp. 1209 (S.D.N.Y.1979). The court noted that benefits were fixed and that the employer was obliged to make up deficiencies in earnings, so that benefits did not depend on the success of the plan investments. *Id.* at 1214.

The Marriott Plan is voluntary; an employee may elect not to participate. Participating employees must contribute five percent of yearly earnings and may contribute more, up to an additional five percent. The employer contributes eight percent of its consolidated net profits,[1] less death benefits paid to certain participants, each year.

For plan accounting and allocation purposes, each employee has a savings account, made up of his own contributions, and a company contributions account, consisting of his pro rata share of the annual company contribution. Company contributions vest in the participant at the rate of 10% per year beginning the year after the contribution is made[2] but fully vest upon death, disability, retirement or 20 years' service with the company. When employees terminate participation in the Plan before their company contributions are fully vested, the unvested portions are distributed to company accounts of remaining participants.

Net income on trust assets is distributed as "fixed" income to participants' savings accounts and to combined accounts of retired participants and vested company accounts of terminated and former participants at a rate not exceeding six percent. The remaining income, or loss, is applied to active participants' company contributions accounts.

Benefits payable upon retirement, or other termination, depend on the employee's final account balance. The account balance consists of the employee's contributions, plus "fixed rate" income on them; vested

---

1. The contribution is subject to certain ceilings. See Plan § 4.1(a). Net profits are determined before contributions, employee bonuses, and taxes. § 4.2(a).

2. Each year's contribution vests at this rate, so that, for example, after four years' participation, 30% of the first year's contribution is vested, 20% of the second year's contribution is vested, and 10% of the third year's contribution is vested. Plan § 8.3.

employer contributions; a share of other participants' forfeited employer contributions; and net income or loss on investment of trust assets. By electing to participate in the Plan, an employee shares in company profits, since employer contributions depend on, and vary with, net profits.[3] The extent of his share in such profits depends on his own contributions and on the extent to which the contributions have vested. He also receives a return on the amount he contributes, as a share of net income earned on trust assets. The rate of this "fixed" return is set each year by Plan fiduciaries but may be no greater than six percent.

Benefits on death, disability or retirement are paid by one of the following methods: lump sum, purchase of annuity, installment payments, or a variable payment account with an investment company. Benefits may be withheld until age 65. The method of payment is within the discretion of the fiduciaries. Payment may be made in cash, securities, or other property. Plan § 9.5.

■ Although the question is a close one, I find, upon analysis, that the investment was not made with expectation of profit solely from the efforts of others. It is true that, unlike plans discussed in other cases, the Plan benefits are not fixed. Employer contributions, even though based on employer profits, constitute a significant portion of the return on the investment. Although the vesting requirements are not as stringent as in *Daniel*, for example, they do make length of participation a significant factor upon which the ultimate benefit is based, ten years being required for full vesting of each year's contribution or 20 years service with the company required. Another portion of a participant's final benefit comes not from the efforts of those who manage the investment but from other participants' withdrawals before full vesting. Over the years this source of added sums was significant to Ms. O'Neil's total account. The amount of return on the employee's own contributions, which may vary from year to year, is fixed in the sense that it may be no greater than six percent, and thus does not depend on earnings on the amount invested.

### 2. Standing as a trust beneficiary

Plaintiff asserts that even if her interest in the Plan is not a security, she has standing, as a beneficiary of the Trust, to bring an action for securities fraud, similar to a stockholder's derivative action on behalf of a corporation against corporate insiders. The United States Court of Appeals for the Second Circuit has recognized such standing in a suit by a pension fund beneficiary challenging the trustees' purchase of securities. *Kirshner v. United States*, 603 F.2d 234 (2d Cir. 1978). A Seventh Circuit case involving a suit by trustees of benefit plans against a retained fiduciary, indicates that court would not permit an action under the securities laws for fiduciary misconduct. *O'Brien v. Continental Illinois Nat'l Bank & Trust Co.*, 593 F.2d 54 (7th Cir. 1979).

Analysis begins with *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), in which the Supreme Court held that a private cause of action under § 10 of the 1934 Act and Rule 10b–5 was available only to a defrauded purchaser or seller, adopting the rule of *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.) *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). The Court defined three classes of plaintiffs barred by the *Birnbaum* rule, potential purchasers who decide not to buy, shareholders who decide not to sell, and shareholders and others related to an issuer who sustain loss in the value of an investment of corporate or other insider activities. *Id.* 421 U.S. at 737–38, 95 S.Ct. at 1926. The Court noted that it had been held that shareholder members of the second and third classes may be able to circumvent the *Birnbaum* limitation by bringing a derivative action on behalf of the corporation if it is a purchaser or seller

---

**3.** If there are no net profits, as the term is defined in the Plan, the employer has no obligation to make a contribution. There was throughout the period involved in this case always an employer contribution.

of securities but stated that the first class could not claim the benefit of such a rule. *Id.* at 738, 95 S.Ct. at 1926. Although the Court only acknowledged the derivative action exception, it did not rule it out. The *Kirshner* court took this into account. 603 F.2d at 240.

Even the derivative suit exception requires a purchase or sale, in connection with which securities fraud is alleged, by the Plan. Plaintiff pointed in her memorandum to the Plan's acquisitions of Marriott stock, through acceptance of stock contributions in lieu of cash, in 1972, 1973, 1975 and 1976 as "purchases" by the Plan. She uses the "forced sale" cases by way of analogy, contending that this is merely the reverse situation.

Although "purchase" and "sale" can be defined broadly under the securities acts, I find that there was no purchase by the Plan in its acceptance of the stock contributions. In *Kirshner*, for example, plaintiff challenged the trustees' purchase of New York City securities, an actual purchase. In *Hackford v. First Security Bank*, 521 F.Supp. 541 (D.Utah 1981), although the court found no duty to disclose and no security, there was a sale. The Plan gives the trustees no discretion to refuse a stock contribution by the company. The pertinent provision, section 4.3, reads: "Payment may be in cash, treasury, or authorized and unissued common stock of Marriott Corporation or in such other property of any kind as the Named Fiduciaries may authorize the Trustees to accept."

Counsel for plaintiff referred at oral argument to numerous open market transactions of the Plan in Marriott Corporation stock during the period of time with which this case is concerned. These were not tied in with the securities fraud alleged to have been committed, except in a general way. *See O'Brien*, 593 F.2d at 61–63.

In summary, I find that plaintiff has stated no cause of action under the federal securities laws. Claims I and II of the amended complaint must be dismissed with respect to the federal securities law claims.

### 3. State securities act claim

The Maryland Securities Act defines a security in a manner identical to federal law, *see* Md. Corp. & Ass'ns Code Ann. § 11–101(*o*) (1975). There is a dearth of Maryland law on the reach of the state statute. In light of the identity of the statutory terms and in the absence of state law to the contrary, the reasonable conclusion is that the Maryland courts would not find a cause of action under state law when there is none under federal law. The state securities law claims contained in Claims I and II of the amended complaint are accordingly dismissed.

## ERISA CLAIMS

Claims III, IV and V charge that by reason of the acts and conduct mentioned above the defendants violated §§ 403, 404 and 406 of ERISA. Defendants moved to dismiss the counts for failure to state a cause of action on the ground that the complaint alleges no conduct that occurred after January 1, 1975, when the ERISA standards of fiduciary conduct took effect.

Claim III incorporates earlier factual allegations and states that defendants failed to discharge their fiduciary duties "by selling stock held by the Trust in Marriott Corporation and thus limit the losses sustained..." and disregarded their duty to invest assets for the benefit of the Trust in a prudent manner but rather for the purpose of wilfully defrauding the Trust for their own benefit, thus violating § 403(c)(1) and 404(a)(1) of ERISA. Claim IV asserts a violation of § 406(b)(1) and (b)(2), dealing with Plan assets in his own or an adverse third party's interest, by the "aforementioned" course of conduct. Claim V alleges that the "aforementioned course of conduct" was a violation of the prudent man standard of § 404(a)(1)(B) and the diversification requirement of § 404(a)(1)(C).

The "course of conduct" to which the ERISA claims refer is alleged to have occurred over a period of time beginning in 1960 and continuing thereafter, primarily through 1975. The conduct can be summa-

rized as using the Plan investment power to advance the interests of the corporation and the individual defendants, to the detriment of the interests of the participants. Plaintiff points in her opposition to the following specific acts occurring after January 1, 1975, most of which are not mentioned in the complaint:

1. Marriott's making its contributions to the Plan in stock in fiscal years 1975 and 1976 and the Trust's retention of this stock;

2. Deceptive statements concerning investment policy in a May 1975 booklet;

3. Adoption of a policy of investing one-third of the trust's assets in Marriott stock while applying a different standard to other investments and failing to disclose this policy until November 1975;

4. Failure to take remedial action to recover losses resulting from pre-ERISA fiduciary misconduct.

ERISA preempted state law relating to employee benefit plans, 29 U.S.C. § 1144(a), but further provided that the preemption provision "shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975." The United States Court of Appeals for the Fourth Circuit has held that substantive provisions of ERISA did not apply to the claim of an employee who first demanded his pension benefits on August 15, 1973 and terminated employment on June 1, 1974. *Martin v. Bankers Trust Co.*, 565 F.2d 1276 (4th Cir. 1977). The Court rejected a theory that failure to pay benefits was a continuing breach of duty that would bring the claim under ERISA. *Id.* at 1279.

■ Several cases have held that ERISA gives rise to present duties concerning pre-1975 investments, for example, divestiture of investments made earlier. *Morrissey v. Curran*, 567 F.2d 546 (2d Cir. 1977); *Gilliam v. Edwards*, 492 F.Supp. 1255, 1261 (D.N.J. 1980); *Marshall v. Craft*, 463 F.Supp. 493, 496–97 (N.D.Ga.1978); *cf. Trustees of Retirement Benefit Plan v. Equibank, N.A.*, 487 F.Supp. 58, 62 (W.D.Pa.1980) (relationship of pre- and post-ERISA claims; pen-

dent jurisdiction exercised); *Fulk v. Bagley*, 88 F.R.D. 153, 159–60 (M.D.N.C.1980) (dismissal inappropriate where defendants conceded there were allegations of post-1974 acts); *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 638 n. 3 (W.D.Wis. 1978) (plaintiffs attacking post-ERISA conduct with respect to pre-ERISA loans). This proposition is not foreclosed in this circuit by *Bankers Trust*, in which both the acts complained of had occurred and the cause of action had accrued before 1975. As the courts have emphasized, it is not the pre-ERISA act or conduct that creates a continuing liability but post-ERISA acts or omissions where ERISA has created new, or changed responsibilities. So long as a plaintiff's claims are confined to post-ERISA conduct, the ends of § 1144 and the broad remedial purposes of ERISA are served.

■ There is a question in this case whether sufficient allegation of post-ERISA conduct have been made. The complaint itself primarily alleges the continuing course of conduct; it does not specify, as plaintiff has in her opposition to defendants' motion, the specific acts that occurred after ERISA was enacted and the specific ways in which it is supposed to have been violated. The complaint does allege that the general course of conduct continued through 1975, and the acceptance of a company stock contribution in 1975 is mentioned. I find that, bearing in mind the minimal requirements of notice pleading under the federal rules, Claims III, IV and V sufficiently allege post-ERISA conduct to survive this motion to dismiss.

## PENDENT STATE CLAIMS

Defendants moved to dismiss Claim VI of the amended complaint, the state common law claim for breach of fiduciary duty, on the ground that pendent jurisdiction should not be exercised where the federal claims are dismissed. At argument, counsel stated their positions on whether pendent jurisdiction should be exercised if the securities claims, the ERISA claims, or both were dismissed.

■ Where state and federal claims asserted in a single action derive from a "common nucleus of operative fact," and the federal claim is substantial in the jurisdictional sense, a federal court has the constitutional power to decide the pendent claims. *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 371, 98 S.Ct. 2396, 2401, 57 L.Ed.2d 274 (1978); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1965). If there is no statutory bar to the exercise of jurisdiction, *see Owen Equip. & Erection Co.*, 437 U.S. at 372–73, 98 S.Ct. at 2401–02, the federal court has discretion to entertain the pendent claims, provided the federal claim has sufficient substance to confer subject matter jurisdiction, *Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138. The federal court's discretion is to be exercised sparingly, in light of considerations of comity, judicial economy, and fairness to the litigants. *Id.* at 726, 86 S.Ct. at 1139. The relationship and relative predominance of the federal and state issues are to be considered. *See id.* at 726–27, 86 S.Ct. at 1139.

■ Plaintiff's federal claims were based on the securities acts and ERISA. Although the securities acts claims have been dismissed, they were far from insubstantial. The remaining federal claims are for breach of fiduciary duties under ERISA, and cover causes of action accruing or acts or omissions occurring after its effective date of January 1, 1975. The ERISA claim must be brought in federal court. 29 U.S.C. § 1132(e)(1). ERISA preempts state fiduciary law insofar as it related to employee benefit plans, *id.* § 1144(a), although not as to causes of action accruing or acts occurring before its effective date, *id.* § 1144(b). It thus appears that Claim VI is necessarily limited to pre-ERISA conduct, *Brink v. DaLesio*, 496 F.Supp. 1350, 1367 (D.Md. 1980), or at least to causes of action accruing before the effective date of ERISA, *Woodfork v. Marine Cooks & Stewards Union*, 642 F.2d 966, 971 (5th Cir. 1981). Exactly what will be governed by ERISA and what conduct will be governed by state law is unclear at this stage since plaintiff attacks allegedly continuing practices and policies, as well as specific acts and omissions.

■ Whatever the governing law and cause of action, the basis for the state and federal claims is similar—acts, omissions, policies and practices allegedly constituting breaches of fiduciary duties relating to the Marriott Plan. The time of occurrence, pre- or post-ERISA, is the main distinction. As indicated above, in the context of the allegations made in this case, January 1, 1975 may not provide a clear dividing line between the state and federal claims. I find that there is a "common nucleus of operative fact" between the state and federal claims that renders the exercise of pendent jurisdiction constitutionally permissible. *Trustees of Retirement Benefit Plan v. Equibank, N.A.*, 487 F.Supp. 58, 60–61 (W.D.Pa.1980); *see Morrissey v. Curran*, 567 F.2d 546, 549 n. 11 (2d Cir. 1977).

A number of factors make the exercise of pendent jurisdiction advisable in this case. Jurisdiction of the ERISA claims is exclusive, so it is only in the federal courts that the federal and state claims, which are clearly related, can be tried in a single action. It appears, based on the information available at this stage of the proceedings, that proof of the federal claims will entail some (and possibly a great deal) exploration of events that occurred before January 1, 1975. *See Equibank*, 487 F.Supp. at 62. A class action has been certified, and it is likely that trial of this case would be fairly lengthy. Judicial economy dictates trial in the one forum in which both claims can be combined.

■ Finally, it appears that limitations probably makes a state action unavailable at this point. This action was filed April 1, 1977. Although the various papers indicate factual disputes concerning when plaintiff knew or should have known of defendants' actions, she obviously knew at some time before this action was filed. The general statute of limitations is three years, Md.Cts. & Jud.Proc.Code Ann. § 5–101 (1980), and Maryland has no "savings" statute. The running of the limitations period is tolled by the filing of suit, *e.g., Neel v.*

*Webb Fly Screen Mfg. Co.,* 187 Md. 34, 48 A.2d 331 (1946), but there is no indication that Maryland courts would hold that filing suit in federal court similarly tolls the running of the statute. Other federal courts have held that retention of pendent state claims barred by limitations is proper, even where all federal claims have been dismissed. *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir. 1982); *Rheaume v. Texas Dep't of Pub. Safety,* 666 F.2d 925, 931–32 (5th Cir. 1982); *O'Brien v. Continental Illinois Nat'l Bank & Trust Co.,* 593 F.2d 54, 63–65 (7th Cir. 1979). Discretion dictates the exercise of jurisdiction over the pendent state claims in this case.

## SPECIFICITY UNDER RULE 9(b)

■ Defendants moved to dismiss all counts of the complaint on the ground that the basis of all is fraud, or misrepresentation, and that plaintiff has failed to specify the particular misrepresentations each defendant is alleged to have made and has otherwise failed to meet the requirements of F.R.Civ.P. 9(b). Claims I and II, the securities fraud claims, have been dismissed on other grounds, so it is necessary to discuss this contention only with respect to the remaining counts. The better rule is that because F.R.Civ.P. 9(b) is an exception to the general liberal notice pleading requirement of the federal rules, its application is narrow and should not be extended to other causes of action. 5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1297 (1969). Since Claims III through VI are not subject to the requirements of Rule 9(b), they will not be dismissed.